**Kenneth E. AHOLA and Helen Ahola, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 4–67 Civ. 350.**

United States District Court
D. Minnesota,
Fourth Division.
July 1, 1969.

Fredrikson, Byron & Colborn, H. M. Fredrikson, Jerome B. Pederson, Lawrence Perlman, Minneapolis, Minn., for plaintiffs.

Patrick J. Foley, U. S. Atty., Donald Anderson, Dept. of Justice, Washington, D. C., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

NORDBYE, District Judge.

### FINDINGS OF FACT

1. This is an action for the recovery of federal income taxes collected from the plaintiffs and jurisdiction is conferred upon this Court by 28 U.S.C. § 1346(a) (1).

2. The plaintiffs are suing to recover a refund of a portion of the federal income taxes they paid for the calendar year ending December 31, 1966, pursuant to a joint return. The plaintiff, Kenneth E. Ahola, M. D., is an employee of the Mesaba Clinic and the suit for refund is based exclusively on income attributable to him by reason of such employment. Dr. Ahola (hereinafter referred to as the taxpayer) included in his taxable income for the year 1966, an amount as income from the Mesaba Clinic in excess of the salary he received as an employee of the Mesaba Clinic. The additional 1966 income arose from computing the taxpayer's income from the Clinic as if the Clinic was taxable as a partnership and he was a partner. This suit was commenced for the primary purpose of determining whether the Mesaba Clinic is taxable as a corporation or a partnership under the 1954 Internal Revenue Code. The parties have stipulated that the central and controlling issue to be adjudicated in this action is whether the Mesaba Clinic, a business trust under the laws of Minnesota, is entitled to be taxed as a corporation under the 1954 Internal Revenue Code. The parties have stipulated for the purpose of this action that if the Mesaba Clinic is taxable as a corporation the profit sharing plan adopted by it qualifies under Section 401 of the 1954 Internal Revenue Code. The plaintiffs are entitled to a refund in the amount of $10,424.53 with interest according to law if the Mesaba Clinic is entitled to be taxed as a corporation under the 1954 Internal Revenue Code.

3. Prior to June 1, 1954, five doctors were engaged in the practice of medicine in Hibbing, Minnesota, under the form of a partnership. They decided to form a business trust for the purpose of operating a medical or surgical clinic and the services incidental thereto for a profit. Thus, on June 11, 1954, the Declaration of Trust by the Board of Trustees of Mesaba Clinic was executed to be effective as of June 1, 1954.

4. The Declaration of Trust (hereinafter referred to as the trust) created a Board of Trustees to be designated the Board of Trustees of Mesaba Clinic, and under that name, or the name Mesaba Clinic, directed the Board to conduct all business in the performance and fulfillment of the trust.

5. The trust instrument provides that the Board of Trustees are authorized and empowered to utilize the corpus of the trust and additions thereto, as the Board shall deem fit for the operation of a medical or surgical clinic or clinics or any allied business or professional pursuit.

6. The trust provides that the Board of Trustees are to be elected annually with the power to fill vacancies on the Board by appointment.

7. Article 6 of the trust provides that the Board of Trustees shall hold the legal title to all property at any time belonging to the trust, shall have absolute control, management and disposition thereof, and shall likewise have absolute control and conduct of the business of the trust. In addition to such broad powers, the Board of Trustees is given a number of specific powers including the power to contract on behalf of the trust, to borrow money for the purpose of the trust, to give obligations of the trust as security, to formulate and from time to

time amend such rules for the management and conduct of the business of the trust as the Board in its sole discretion may deem expedient, and in general to enter into all manner of contracts in connection with each and all of the specific powers granted to it.

8. Article 7 of the trust provides that the Board of Trustees shall hold regular meetings and may call special meetings and shall cause to be kept minutes of all meetings.

9. The trust provides that the trustees shall elect officers and establish rules defining their duties and shall have the power to appoint other officers or agents as it may deem expedient and to define their duties.

10. The trust directs the trustees to fix the compensation of all officers, agents and employees and gives the trustees the authority to remove any officer, agent or employee as it deems expedient.

11. The trust provides for the issuance of units of beneficial interest to be evidenced by certificates in such form as the trustees shall determine, title thereto passing only upon registration on the books of the trustees. Units of beneficial interest were issued on June 11, 1954, and additional units have been purchased and issued from time to time subsequent thereto. The trust keeps and maintains a record which reflects the units issued, the units cancelled, and the Revenue stamps in connection with such transfers.

12. The entire voting power of the beneficiaries of the trust is vested in the holders of Class A units of beneficial interest. Article 13 of the trust defines the nature of the beneficial interests as follows:

"Beneficial interests hereunder shall evidence only such rights as are specifically set forth in this declaration. Specifically, it is not intended hereby to create any relationship of partnership or agency among the members of the Board of Trustees, or among the Board and the beneficiaries, or among the beneficiaries. The death of a beneficiary shall not operate to terminate the trust, nor shall such event entitle the legal representatives of the estate of the deceased beneficiary to an accounting or to take any action against the Board of Trustees. Ownership of beneficial interests shall not entitle a beneficiary to any title in or to trust property, or right to call for a partition thereof, or for an accounting."

13. The trust grants to the trustees the discretion to make distribution to the beneficiaries of the net earnings of the trust as the trustees in the exercise of their sole discretion determine.

14. The trust was amended on May 30, 1955, March 21, 1960, and on June 1, 1968. The latter amendment, which occurred after the tax year in question, amended Article 21 of the trust and made the duration of the trust perpetual, whereas the original duration of the trust was for a term of 20 years. Such amendment was adopted to take advantage of Minnesota Statutes, § 318.02, subd. 3(1) (1965), which statute was adopted in 1961 and provided that any organization theretofore organized shall have the power to continue as a business trust for the time limited in its declaration of trust, or if no time limit is specified, then perpetually.

15. Limited liability is provided for by Minn.Stat. § 318.02, subd. 4. The provisions of Articles 17 and 18 of the trust also provide for limited liability. Article 17, entitled "Relationship and Liability to Patients", provides as follows:

"Specifically, it is not intended hereby to change or alter the relationship existing between a physician and his patient and no Trustee or beneficiary shall have any right whatsoever to interfere with the treatment given by a physician or surgeon in the employ of the Board of Trustees to a patient under his care. A physician or surgeon in the employ of the Board, whether or not he may also be a Trustee or beneficiary, shall have and be subject to all the duties, responsibilities and liabilities toward patients to whom he

administers as may customarily obtain between physician and patient. But no physician or surgeon who has not treated or administered personally to a patient shall have any personal liability whatsoever to such patient."

Article 18, entitled "Liability of Trust Property", provides as follows:

"Except as stated in the article immediately preceding, all persons extending credit to, contracting with or having a claim against the Board of Trustees shall look only to funds and property of the trust for the payment of any debt, damage, judgment, decree, or any money that may become due or payable to them from the Board of Trustees. Neither the Trustees nor the beneficiaries, officers or agents, present or future, shall be personally liable therefor, and the Board of Trustees, in the discretion of the Board, may stipulate in any written contract or obligation that neither the Board of Trustees nor the beneficiaries, officers or agents, shall be held to any personal liability under or by reason thereof. In case any Trustee, beneficiary, duly authorized officer or agent, shall at any time, for any reason, be held to or be under any personal liability in connection with the trust, not due to his action in bad faith, then he shall be held harmless and indemnified out of the trust estate from all loss, cost or expense by reason of such liability."

16. On June 11, 1954, the Board of Trustees purchased the assets of the former partnership. The first meeting of the Board of Trustees of the trust was held on June 11, 1954, at which time the Board elected officers, issued units of beneficial interest in the trust, adopted banking resolutions, authorized the leasing of clinic buildings, and adopted a resolution pertaining to doctors' compensation.

17. The trust leases the clinic buildings in which it presently operates from a building corporation and holds title to a house in Chisholm, Minnesota.

18. From the outset the administration of the trust has been carried out pursuant to the authority vested in the Board of Trustees by the trust and any amendments thereto. The Board of Trustees, in the exercise of its sole authority and discretion, has managed the property and affairs of the trust, including, but not limited to hiring and firing employees (including doctors), determining compensation for each doctor-employee on the basis of income produced, seniority, and a general consideration of his worth to the clinic, establishing salary schedules for all non-doctor employees, authorizing the purchase of fixtures and equipment, establishing policies and procedures to be followed by all employees, determining vacations and working hours for all employees, establishing the forms to be used by the trust, establishing the records to be kept by the trust and regulating their use and disposition, setting the usual and customary fee, including courtesy discounts to be followed in charging for services rendered, and many other functions incidental to the management and operation of the business of the trust. The Mesaba Clinic was operated and physicians employed by it practiced their profession in conformity with the canons of the American Medical Association as set forth in Government Exhibit A.

19. Annually, the beneficiaries of the trust holding units of beneficial interest in the trust have elected trustees.

20. Although the Board of Trustees has delegated to a clinic manager many of the duties and responsibilities of running the day to day operations of the clinic, it continues to exercise general supervision over him and he in turn seeks authority from the Board.

21. The Board of Trustees meets periodically and minutes of such meetings have been kept in the regular course of business in a minute book maintained by the trust. Although the Board of Trustees would on occasion hold general meetings attended by all doctors employed by the trust, such meetings would

be for the purpose of informing the group of Board decisions or to enable the Board to be informed on certain matters by the employees, but in all instances the Board would reserve the right and discretion to make the final decision on any matter.

22. The right to sell or transfer units of beneficial interest to other beneficiaries of the trust is not subject to any restrictions. When a doctor wished to sell units of beneficial interest which he owned in the trust, the Trustees purchased them on behalf of the Board of Trustees or arranged for their transfer to another doctor or doctors practicing medicine at the Clinic. However, restrictions on the transfer of the units of beneficial interests to persons other than trust beneficiaries are comparable to those which normally would be imposed on the transfer of stock in closely held corporations.

23. All fees for medical procedures performed by any employee of the trust are received by the trust and belong to it.

24. In the tax year in question the trust employed 53 persons including doctors and the operation of the Clinic had been departmentalized.

25. Doctors employed by the trust are subject to arbitrary patient assignment and the Board of Trustees audits and supervises doctor-employees to the extent deemed necessary.

26. The Mesaba Clinic has held itself out to the public in all respects as an entity and not as a partnership or a group of doctors officing together and engaging in individual practices. The Hibbing telephone directory does not contain any listing of the individual doctors employed by the Clinic in its classified section, the sole reference being to the Clinic. All bills for services rendered by doctors employed by the trust are sent to patients on forms bearing only the name of "Mesaba Clinic" without reference to the doctors employed by it. Contracts in writing made on behalf of the trust are executed by the officers and trustees of the trust. All stationery used by any personnel for professional or Clinic correspondence bears only the name "Mesaba Clinic".

27. On the 1966 personal property tax returns for the trust it reported such tax as a business trust and not as a partnership. Similarly, the doctors employed by the trust are treated as employees for the purposes of unemployment tax, workmen's compensation insurance and for withholding of state and federal income taxes and social security taxes, whereas such treatment would not be followed in the operation of a partnership because partners are not considered in the computation for federal unemployment taxes nor are state or federal income taxes or social security taxes withheld from partnership draws. Since its inception the trust has also filed state and federal corporate income tax returns and has paid taxes as a corporation.

28. In 1965 the so-called Kintner Regulations promulgated by the Treasury in 1960 under § 7701 of the 1954 Internal Revenue Code were amended by the addition of language to paragraph (c) of Treas.Reg. § 301.7701–1, the addition of the words "including organizations labeled 'corporations'" to the heading of § 301.7701–2 which previously read "associations", the addition of a new paragraph 5 to § 301.7701–2(a), the deletion of example (1) under paragraph (g) of § 301.7701–2, and the addition of subparagraph (h) to § 301.7701–2. The foregoing 1965 amendments are inconsistent with the explicit language of § 7701(a) (2) and (3) of the 1954 Internal Revenue Code, are inconsistent with all relevant judicial decisions rendered prior to their promulgation, are in conflict with the Treasury's prior regulations thereunder, and deliberately discriminate against professional corporations or associations formed by doctors or lawyers in the application of the provisions of the Internal Revenue Code.

## CONCLUSIONS OF LAW

1. The Mesaba Clinic trust is entitled to be classified as an association

taxable as a corporation as such terms are defined in § 7701(a) (3) of the 1954 Internal Revenue Code.

2. Although this Court is not passing on the validity of the so-called Kintner Regulations promulgated in 1960 under § 7701 of the 1954 Internal Revenue Code, the Mesaba Clinic trust would clearly have been taxable as a corporation under the criteria they set forth for classification of an entity as an association taxable as a corporation. Treas.Reg. §§ 301.7701–1 and 301.7701–2 as amended in 1965 are invalid and thus are entitled to no weight in the decision of this case because they are inconsistent with all relevant judicial decisions rendered prior to their promulgation, they conflict with the Treasury's prior Regulations, and they deliberately discriminate against professional associations formed by doctors or lawyers.

3. The plaintiffs are entitled to a judgment against defendant for the principal amount of $10,424.53 with interest at six percent (6%) thereon from April 17, 1967 according to law.

### ORDER FOR JUDGMENT

Judgment will be entered for the plaintiffs accordingly.